# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOHN FORD,** | ) | |
| **Plaintiff,** | ) | |
| | ) | No. _____ |
| **v.** | ) | |
| | ) | |
| **STEVE PAGE, in his individual and** | ) | |
| **official capacities, RICHARD LYNCH,** | ) | |
| **in his individual and official capacities,** | ) | |
| **and WHITE COUNTY, TENNESSEE,** | ) | |
| **Defendants.** | ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, **JOHN FORD**, and sues the Defendants, **STEVE PAGE**, in his individual and official capacities, **RICHARD LYNCH**, in his individual and official capacities, and **WHITE COUNTY, TENNESSEE**. In support of the foregoing, the Plaintiff would state and aver as follows:

### I.     JURISDICTION AND PARTIES

1.     The Plaintiff, John Ford ("Plaintiff," "the Plaintiff," or "Mr. Ford"), is a citizen and resident of White County, Tennessee. At all times material herein, Mr. Ford was employed by White County, Tennessee as a Detective with the White County Sheriff's Department. In fact, in his nearly 15 years of employment by the White County Sheriff's Department as a commissioned officer almost all of that time he has been employed as a Detective.

2.     Defendant White County, Tennessee ("White County") is a duly organized political subdivision of the State of Tennessee and a "person" as defined by 42 U.S.C. § 1983. Furthermore, White County is an "employer" as defined by T.C.A. § 50-1-304. White County

1

may be served with process through its County Executive, Denny Wayne Robinson, 1 East Bockman Way, Room 205, Sparta, Tennessee 38583.

3. Defendant Steve Page ("Defendant Page," "Mr. Page," or "Sheriff Page") is the duly elected Sheriff of White County, Tennessee. Moreover, Sheriff Page is a "person" as defined by 42 U.S.C. § 1983. The Plaintiff would allege that, at all times material herein, Sheriff Page was acting under the color of law and in his capacity as the chief law enforcement executive and/or officer of White County, Tennessee. Sheriff Page is being sued in both his official and individual capacities. Sheriff Page may be served with process at his office located at 111 Depot Street, Suite 4, Sparta, Tennessee 38583.

4. Defendant Richard Lynch ("Defendant Lynch or" "Mr. Lynch") is an employee of White County, Tennessee as a Major with the White County Sheriff's Department and a member of the command staff. Moreover, Mr. Lynch is a "person" as defined by 42 U.S.C. § 1983. The Plaintiff would allege that, at all times material herein, Mr. Lynch was acting under the color of law and in his capacity as an employee of White County, Tennessee and a supervisor/ commander within the White County Sheriff's Department.

5. While he has not been named as a defendant in this cause of action, Kenny Dobson (also "Mr. Dobson" or "Deputy Dobson") was involved in events surrounding the termination of the Plaintiff and there are references to him in this complaint. At all times material hereto, Mr. Dobson was an employee of White County, Tennessee as the Chief Deputy with the White County Sheriff's Department.

6. While she is not named as a defendant in this cause of action, Defendant Cami Howard (also "Ms. Howard") was involved in events surrounding the termination of the Plaintiff and there are references to her in this complaint. At all times material hereto, she was an

employee of White County, Tennessee as, among other roles, Director of Administration and Public Information Officer, of the White County Sheriff's Department. The Plaintiff would allege that, at all times material herein, Ms. Howard was acting under the color of law and in her capacity as an employee of White County, Tennessee and a Director of Administration and Public Information Officer within the White County Sheriff's Department.

7.     The civil rights claims made in this Complaint are being made pursuant to 42 U.S.C. §§ 1983, 1988 and the First and Fourteenth Amendments to the United States Constitution. This Court maintains subject matter jurisdiction over the state claims made in this Complaint pursuant to 28 U.S.C. § 1367. The Plaintiff brings his state law claims pursuant to T.C.A. §§ 16-10-101, *et. seq.*, § 50-1-304, *et. seq.*, and the common law of the State of Tennessee. The Plaintiff's claims for punitive damages under Tennessee law are being made pursuant to T.C.A. § 29-39-104 and Tennessee common law.

8.     The acts and occurrences giving rise to this action all occurred in White County, Tennessee. Thus, venue is proper.

## II.     <u>MATERIAL ALLEGATIONS</u>

9.     The Plaintiff would adopt and re-state the allegations in paragraphs 1-8 as fully set forth herein.

10.     Mr. John Ford was employed by White County, Tennessee as a Detective with the White County Sheriff's Department or Office until he was terminated by Sheriff Page and Investigator Lynch, and Chief Deputy Dodson on May 11, 2020. Up and until that time, Mr. Ford would submit he was good and respected law enforcement officer with only a few minor blemishes on his distinguished record. In fact, shortly after his election as the White County Sheriff, Sheriff Page promoted the Plaintiff to Captain over the entire investigative division.

3

11.     On or about April 3, 2020, former White County Sheriff's Deputy Brandon Young, a K9 officer, set out to apprehend a fugitive, Tanya Qualls ("Ms. Qualls"), in White County, Tennessee.  Ms. Qualls was wanted for a violation of her probation.  Deputy Young, along with other deputies, believed they had located Ms. Qualls, who had hidden in the apartment of neighbor Serena Simpson.  White County officers were able to gain access to Ms. Simpson's apartment by obtaining a key from the property manager.  Despite later claiming Ms. Qualls was dangerous and expressing concern about the possibility of a weapon, it was later confirmed Ms. Qualls had no weapon and all actions and conduct by law enforcement on that day indicate she was no threat.  Their conduct during the arrest also indicates they did not consider her dangerous or as possessing a weapon.

12.     Regardless, after combing Ms. Simpson's apartment for several minutes, Ms. Qualls was finally located in a small closet in the bathroom.  Deputy Young immediately sicced his attack dog on Ms. Qualls for an extended period of time, causing her extensive injuries.  The command to attack Ms. Qualls was repeated after she was already in distress and clearly not a threat to anyone.  Body camera footage indicates Ms. Qualls did not resist and was not a danger or a threat to the officers or the dog.  Mr. Ford was not a part of this raid or the arrest of Ms. Qualls.  Deputy Young would later make several questionable claims on his arrest report and in the warrant for her arrest for additional criminal charges, including the obvious falsehood that Ms. Qualls "resisted arrest."

13.     Ms. Qualls was hastily charged with resisting arrest and quickly taken before the White County General Sessions Court to plead guilty.  This all occurred without the benefit of the body camera footage.  Once the body camera footage was made available to the District Attorney's office, the plea was subsequently set aside by agreement between Ms. Qualls'

4

attorney and the District Attorney, and the charge was dismissed. Deputy Young and another deputy, not knowing Young's body camera was still active, were recorded celebrating the dog attack and admiring the damage inflicted upon Ms. Qualls by the dog.

14.     Sheriff Page was at first sufficiently concerned about the arrest of Ms. Qualls, and the use of the K9 unit, that he asked Mr. Ford to perform an internal investigation. This occurred on April 8, 2020. Because of a doctor's appointment on April 8, the Plaintiff asked Detective Muncy to bear most of the responsibility of the initial investigation, including collection of necessary documents, videos, and a complete criminal history of Ms. Qualls. The White County Sheriff's Department does not have a formal internal affairs division or unit, but there have been past internal investigations and the Plaintiff has been involved in most, if not all of those investigations in some capacity, either as a lead investigator or in a supervisory role. Before Detective Ford had seen the video of the dog attack, Chief Deputy Dobson and Officer John Meadows watched the video and expressed concern to him that what they had witnessed "was bad." The Plaintiff told these two Officers that if the video was truly bad, the department should probably have an independent body or outside agency investigate. Officer Meadows advised the Plaintiff that Sheriff Page would not like that suggestion. The Plaintiff also indicated that if he had to investigate, he would perform a thorough investigation and the sheriff "might not like" the outcome. Officer Dobson responded that the Sheriff was not going to fire Brandon Young and he definitely would not agree to send the investigation out to an outside agency. Brandon Young was a favored officer of Sheriff Page. In fact, he considered him one of his best, if not his best, Officer. Sheriff Page campaigned on a promise to remove drugs from the community, and Brandon Young made many drug cases for which the Sheriff's Department received a good

amount publicity. Sheriff Page throughout the events surrounding this Complaint was very protective of Brandon Young.

15.     On April 8, 2020, Detective Muncy did as instructed and pulled all of the necessary documents and audio/visual recordings. After Mr. Ford had taken care of his personal business, he returned to work and reviewed the evidence collected by Mr. Muncy. Detective Muncy immediately voiced his concern to the Plaintiff that the dog attack on Tonya Qualls was troubling and, potentially, criminal. Mr. Ford then sat down with Detective Muncy and watched the video himself. He agreed the video was troubling and could lead to criminal charges or civil liability. In particular, the Plaintiff believed Brandon Young could be charged with the criminal offense of aggravated assault or could be charged with violating Ms. Qualls' Federal Civil Rights. Mr. Ford also reviewed the documents pulled by Detective Muncy, and was more certain the matter should be referred to an outside agency, such as the office of the District Attorney for the Thirteenth Judicial District, or the Federal Bureau of Investigations ("FBI") for consideration of any potential civil rights violations. Without question, Brandon Young exposed himself to criminal liability and both himself and White County, Tennessee to civil liability.

16.     Following his meeting with Detective Muncy, Mr. Ford then requested a meeting with Sheriff Page to discuss the results of the internal investigation. Detective Muncy and the Plaintiff then attended a meeting in Sheriff Page's office. This meeting was ultimately attended by Mr. Muncy, the Plaintiff, Defendant Lynch, Defendant Dobson, and Sheriff Page. Sheriff Page was not in the office at first. However, immediately upon entering his office, Sheriff Page announced in reference to Branon Young that: "he's getting suspended for four days, being sent for more training, and getting a write up in his file. And that's the end of it! It's not to go any further! Does everyone understand?" Following his announcement, Sheriff Page apologized for

6

his harsh and aggressive tone and acknowledged the seriousness of the incident in a more civil manner. Detective Muncy stated to the Sheriff that he didn't want to see another officer charged with a crime or disciplined, but Detective Muncy felt the actions of Deputy Young were not within the policies of the Department and an outside agency should investigate. Sheriff Page thanked him for his comments and suggested if that was his position, the policies may need revision. Sheriff Page asked Deputy Lynch what he thought of the video. Mr. Lynch responded that he thought the dog attack was "really bad," but did not rise to the level of a criminal offense. Deputy Dobson said nothing during this meeting. Sheriff Page agreed with Lynch and stated he did not think it was a crime, and he was not going to "ruin" the career of Deputy Young over the incident. The Sheriff reaffirmed he did not want the incident to go any further and stressed that he considered the matter over. Deputy Lynch indicated it might be a good idea to contact District Attorney General Bryant Dunaway just to let him know what was going on and how the situation was being handled, but stressed that there should be no request for assistance or input. The Sheriff made it clear he wanted this to be the end of the matter. No one in this meeting, including Sheriff Page, asked for any follow up, supplementation, or additional investigation. The Plaintiff and Detective Muncy were expressly directed to end the investigation.

17.     Following this meeting, Detective Muncy returned to the Sheriff's Department annex which housed the investigations' division to complete the written report. After Detective Muncy returned to the annex, he received a call from Sheriff Page before he could complete his work. Defendant Page asked Detective Muncy what he was working on. Mr. Muncy responded that he was completing his time sheet for the week. Sheriff Page then ordered him to bring the entire investigation file, including all evidence, to him at the Sheriff's Department. Detective Muncy inquired if it had to be immediate, or whether could he bring the file the following

morning. Sheriff Page told him he wanted it "now." Mr. Muncy told the Sheriff he would be on his way to the White County Justice Center immediately. The Plaintiff told Detective Muncy document "everything" because he was afraid of a coverup.

18.     By the time Detective Muncy arrived at the White County Justice Center, Sheriff Page was already parked in his vehicle in the front employee parking lot (not in a parking space), along the driveway. Mr. Muncy pulled alongside of the Sheriff's vehicle, rolled down his widow, and handed Sheriff Page the file the Sheriff requested. He also told Sheriff Page the file did not contain all of the original documents, some of which were still in the possession of Captain Meadows, who had possession of the original videos and some of the documentation.

19.     Sheriff Page indicated that he understood the file did not contain all of the original documents, and spontaneously expressed a concern that he did not "trust everyone around the office not to try and take it further." He was clearly referencing the incident of Brandon Young. He also made a reference to not trusting people in the "annex," which is a reference to the Detectives who worked there. Sheriff Page specifically told Detective Muncy that he believed John Ford would take it further and that the Sheriff would terminate him over it. To the knowledge of the Plaintiff, Deputy Young was never suspended and never suffered any repercussions until the investigation came to light and he was under investigation by the FBI. Deputy Young did receive some additional training, for which he was paid, but he was never really punished. In fact, it is believed Deputy Young initially received overtime pay for the training he received. Deputy Young subsequently resigned from the force, effective July 1, 2020. His resignation came shortly after the dog attack and the internal investigation was being investigated by a Nashville news outlet. After Deputy Young's resignation and multiple requests for public records were made by various individuals and entities, the White County Sheriff's

8

Department took affirmative steps to coverup its inaction by claiming they had mistakenly paid Mr. Young and changed his personnel records.

20.    Mr. Ford was directly ordered by Sheriff Page to shut down the investigation into Brandon Young, and he was also aware the Sheriff directed there to be no further discussion about the matter.  Everyone involved in the investigations or who attended the meetings about the investigations was aware the Sheriff did not want any information to be shared with outside agencies or third parties.  Sheriff Page even rebuffed Deputy Lynch's suggestion they give the District Attorney General a "courtesy call."  Mr. Ford considered his role in the matter as an Investigator and a law enforcement officer to be complete on the evening of April 8, 2020.  Mr. Ford was also aware he had no duty, and was not required, to share his findings with the DA's office or any other independent agency.  It was certainly not part of his job duties to report his findings to anyone else, particularly in light of the Sheriff's orders.  However, as a private citizen, he was deeply concerned about the manner in which Ms. Qualls' arrest was handled, her prosecution for resisting arrest, and the arrest/incident report filed by Deputy Young.

21.    Following the April 8, 2020 meeting at the Sheriff's office, the Plaintiff contacted Chris Isom, who is an investigator with the office of the District Attorney.  Mr. Isom worked with Mr. Ford for many years as his partner at the White County Sheriff's Department.  He advised Mr. Isom of the investigation, his (and Muncy's) findings, and indicated he would share their investigative report.  The Plaintiff then directed Detective Muncy to deliver a copy of the investigation file to Investigator Isom.  On or about April 30, 2020 or May 1, 2020, Detective Muncy delivered a copy of the investigation report to Mr. Isom at the DA's office.  The investigative materials were then turned over to the District Attorney General, who then sent a letter to the FBI on May 4, 2020.  Sheriff Page learned that Mr. Dunaway's office had been

9

furnished the investigative file and materials shortly after the transfer and the FBI investigation shortly after May 4, 2020. On May 7, 2020, Sheriff Page remarked to a private attorney that he was under investigation by both the TBI and the FBI. He also expressed that the people around him in his office had triggered the investigations because they were "jealous." The actions taken by the Plaintiff after April 8, 2020 where not taken in his official capacity. Mr. Ford did not actually speak to the FBI until May 8, 2020. The statements and actions taken by Mr. Ford were made outside the workplace, were made to outside individuals and/or agencies, and not within the chain of command, and did not concern matters of his own employment.

22.     Detective Muncy completed his written report ("Supplemental Report") of the investigation on April 9, 2020. On or about May 6 and 7, 2020, three additional pages were added to the original incident report and supplemental report written by Detective Muncy. These three pages consisted of brief one-page reports by three separate Officers who were part of the Tonya Qualls arrest. These reports are merely summaries of each Officer's observations of the arrest, and provide no additional finding or conclusions related to the information already provided to Sheriff Page and Deputy Lynch. A complete copy of the original incident report as supplemented by Detective Muncy and by an unknown entity is attached as Exhibit 1. Exhibit 1 is hereby incorporated into this complaint *in haec verba*.

23.     Following the meeting of April 8, 2020, Sheriff Page was clear he did not intend to ask for an outside investigation into the arrest of Tonya Qualls or the use of the K9 unit by Brandon Young during that arrest. In addition, it was clear there would be no investigation into the representations made by Deputy Young in his arrest report or the criminal warrants which led to Tonya Qualls' original conviction. It was only a month later that the Sheriff and the Department would further supplement the report with formal statements from some of the other

arresting and/or responding officers. It was also clear that Sheriff Page had ordered the internal investigation to cease and for no one to take any additional action. Finally, it was clear Sheriff Page was distrustful of Detective Ford, for whatever reason, and if there was a leak, he was prepared to terminate John Ford as the culprit.

24.     The Plaintiff understood the directives of Sheriff Page. He understood his duties related to the investigation had come to a conclusion and, as far as he was told or understood, there was to be no further investigation and no further reporting. He was told the investigation was over and his official duties related to the investigation were over. The Sheriff stated he was going to punish Deputy Young internally, and that he would receive additional training. As of April 8, 2020, the Plaintiff had no official role in the investigation into the arrest of Tonya Qualls, or the conduct and punishment of Deputy Young. All of the actions taken by John Ford after his report to Sheriff Page on April 8, 2020 were taken as a concerned private citizen.

25.     Detective Ford had no duty to disclose or otherwise report his findings or conclusions to any outside agency. In fact, the White County Sheriff's Department has taken the official position that it was a violation of departmental policy to reveal the investigation report or its contents to any outside agency. Cami Howard, in an official response on behalf of Defendant Page in the White County Sheriff's Department to an inquiry by a Middle Tennessee news outlet, dated July 10, 2020, stated:

> ...It is ultimately the sheriff's responsibility to engage outside agencies to determine if criminal charges are necessary...Thorough internal investigations are imperative to sustain employee accountability at the White County Sheriff's Office. It is not the role or duty of anyone employed at the White County Sheriff's Office to take any internal investigative information outside of the agency without the approval of Sheriff Page. ...

26.     The complete letter authored by Ms. Howard to Ben Hall of News Channel 5 is attached as Exhibit 2. Exhibit 2 is hereby incorporated into this Complaint *in haec verba*. Ms.

11

Howard made these policy declarations on the official letterhead of the White County Sheriff and in her capacity as Director of Administration and its Chief Public Information Official.

27.    Accordingly, it is expressly clear Detective Ford had no official duty or responsibility to share the internal investigation report, its contents, findings, or conclusions with any outside agency or third party. On the contrary, White County, Tennessee and the White County Sheriff's Department considered it a violation of policy and his duties to the department.

28.    The arrest of Tonya Qualls and her treatment by Brandon Young and his K9 unit has always been of tremendous public importance and concern. It touches on important issues that affect every community in this country. In addition, Deputy Young's initial report and arrest warrant affidavit were important to the public and were worthy of additional scrutiny. If the conduct and actions of Brandon Young were not criminal, they were certainly potentially criminal and were deserving of review by the office of the District Attorney General. The orders of Sheriff Page were clear, and Detective Ford knew he could take no action in his official capacity as a law enforcement officer pursuant to the policy directives and direct orders made by the Sheriff. However, given the public importance and concern of the issues, he also felt as a private citizen he had to take some action to bring the arrest and the investigation to light.

29.    As a private citizen, the Plaintiff made the personal decision to reveal the existence of the investigation and the results of the investigation, including the physical investigative report, to the office of the District Attorney General for the Thirteenth Judicial District. Detective Muncy delivered the internal investigation report to Chris Isom and/or Bryant Dunaway at the request of Mr. Ford.

30.    As noted above, the Plaintiff and Mr. Isom have a long-standing relationship. It was, and remains, the Plaintiff's opinion that the results of the investigation, including all of the

12

evidence collected, should have been provided to an outside agency to evaluate for further action. Accordingly, the investigation materials were delivered to the DA's office for further consideration. It was District Attorney Bryant Dunaway who then forwarded those materials to the FBI.

31. The investigation by Detective Muncy and John Ford and the subsequent meetings with Sheriff Page and Deputies Dodson and Lynch all occurred on April 8, 2020. The first call to Chris Isom was also on April 8, 2020. The Plaintiff had multiple conversations with Chris Isom about the Brandon Young investigation and the need for an outside investigation. The Plaintiff was hopeful Sheriff Page would do the right thing and seek outside assistance in investigating Brandon Young. When the Sheriff continued to sweep the incident under the rug and did not punish Brandon Young in any way, John Ford could not remain silent in good conscience. His only recourse was to take action as a private citizen.

32. Mr. Ford also had conversations with the FBI once they began investigating, which occurred shortly after agents received the investigative materials from Bryant Dunaway. Sheriff Page became aware the investigative file had been shared with Bryant Dunaway and the Office of the District Attorney General almost immediately. He became aware of the FBI investigation just a short time later.

33. The Plaintiff continued to attend to his job duties and went about his business as an employee of White County. Consistent with Sheriff Page's direct orders, John Ford was not aware of any additional investigation into Brandon Young. Mr. Ford made a proper written request for time off the week of May 4, 2020. Mr. Ford made the request in writing consistent with the Department's policies and procedures, and provided his written request to his supervisor. Richard Lynch was aware of the Plaintiff's request for leave, as was Cami Howard.

13

Sheriff Page was also aware of Mr. Ford's request for time off work. By this time, Sheriff Page was very aware the investigation of Brandon Young and all investigation materials were provided to the DA's office and the FBI. Predictably, Sheriff Page blamed John Ford for the leaks and the additional scrutiny of Brandon Young and the White County Sheriff's Department.

34.     On May 11, 2020, Detective Ford returned to work and was immediately summoned to the office of Richard Lynch, where he was handed a letter of termination signed by Sheriff Page, Richard Lynch, and Kenny Dobson. This was less than a week after the Brandon Young investigation file was turned over to DA Bryant Dunaway and the initial FBI action. The termination was dated by each of the individuals. Defendant Page signed the termination letter before Dodson, which was odd since the matter would be normally addressed by the Plaintiff's supervisors first. Richard Lynch signed the termination letter on May 5, 2020. Sheriff Page signed the letter on May 8, 2020. However, Dobson did not sign the letter until May 11, 2020. There were no prior meetings regarding insubordination, discipline, or corrective training since December of 2019. There was no advance notice of any problem, and certainly no notice or warning about his termination. The letter cited Mr. Ford's insubordination as the basis of his termination. Lynch and Dobson told the Plaintiff he was being terminated because he "insubordinate" and did not follow "the chain of command." They specifically cited his failure to properly request time off from work. This stated reason for termination is an absolute farce. Detective Ford followed the proper procedure for requesting time off from work. Everyone, including Sheriff Page and Dobson, was aware he was to be off that week, and no one ever raised a question or objection about it. As previously noted, the Plaintiff was a highly regarded and decorated officer. However, there was a reprimand in his file dated in December of 2019. As per proper policy and procedure, this reprimand was signed by the Plaintiff's supervisor and by

the Plaintiff. It was also indicated this was a final warning. Mr. Ford disagreed with this disciplinary action, but he signed the form to acknowledge its receipt and in honor of the chain of command. However, when Mr. Ford's attorneys received copies of his personnel file, there were a series of unsigned and previously unknown disciplinary write-ups that do not resemble anything close to what was previously submitted. These write-ups were clearly created after the Brandon Young investigation leak as a means to discredit John Ford and provide a flimsy pretextual basis for his termination.

35. Within days of talking to the DA's office and providing it with the Brandon Young investigation file, John Ford was terminated. He was not terminated because he failed to follow the chain of command. He properly and officially requested leave from work. The series of write-ups in his file dating in 2020 were fabricated to appear as if John Ford was "habitually insubordinate." John Ford was not fired for being insubordinate. John Ford was fired for communicating with Chris Isom, Bryant Dunaway and the Office of the District Attorney General as a concerned private citizen. John Ford was fired for providing the investigative materials to the DA's office as a private citizen. John Ford was fired for refusing to remain silent about illegal and/or unlawful activities. These were the only reasons he was fired.

36. The termination of John Ford was based solely and exclusively upon his failure to keep quiet about what he believed to be potentially illegal activities, and his disclosure of this conduct to the office of the District Attorney General for the Thirteenth Judicial District and the FBI. John Ford was a law enforcement officer with a superb record. His record and reputation were so good that Sheriff Page made him the Chief of the Investigations Division shortly after the Sheriff's election.

37.     Months after his termination, news of the arrest and the investigation leaked to the Nashville press.  More specifically, journalist Ben Hall and News Channel 5 took an interest in the arrest of Tonya Qualls, the internal investigation, and the resulting termination of John Ford. As a result of a public records request, Defendant Howard wrote a letter along with the public records response in which she characterized the report of Muncy and the Plaintiff as "incomplete."  She further stated the internal investigation case file was "insufficient."  Finally, she indicated Sheriff Page was going to contact the District Attorney's office and other outside agencies once he had completed the investigation.  This is all patently false and directly contrary to all of his directives, orders, and statements to his officers.  The full letter is contained in Exhibit 2.  She went on to mischaracterize the treatment of Brandon Young as some form of punishment and called the Plaintiff "habitually insubordinate," and stated this was the basis of his termination.  Again, this is a complete falsehood that strains any reasonable notion of credulity.  If these events and Mr. Ford's termination were not so serious, Ms. Howard's propaganda would be laughable.  She has defamed the character of not only John Ford, but also Detective Muncy, all in a transparent effort to cover up the actions of the White County Sheriff and other Defendants and the retaliatory discharge of the Plaintiff.

38.     As a direct and proximate of John Ford's termination and the related defamation, he has been damaged and/or injured.  The damages and/or injuries he has suffered includes, but are not limited to: loss of his law enforcement employment; loss front pay; loss of back pay; loss of subsidized health insurance; loss of pension benefits; loss of accumulated vacation time and annual leave; public humiliation; public embarrassment; pain and suffering; mental anguish; defamation to his reputation; loss of the enjoyment of life; and permanent damage to his ability to obtain future employment as a law enforcement officer.

16

### III.  CIVIL RIGHTS CLAIMS

39.  The Plaintiff would adopt and re-state the claims set forth in paragraphs 1-39 as fully set forth herein.

40.  The Plaintiff would submit all of the Defendants were acting under the color of state law at all times material herein.

41.  The Plaintiff had, and continues to have, a First Amendment right of free speech and association as a private citizen.  He would submit he was deprived that right and his termination was in retaliation for the exercise of his First Amendment rights and freedoms as guaranteed by the United States Constitution.

42.  At all times material to this claim, Mr. Ford was exercising his First Amendment rights as a private citizen and not as a law enforcement officer employed by White County, Tennessee.  In fact, it is the stated policy and position of the White County Sheriff's Department and Sheriff Page that no individual, and specifically John Ford, has the role, authority, or duty to discuss internal matters with outside agencies, including the office of the District Attorney for the Thirteenth Judicial District.  When the internal investigation report was complete and the findings reported the sheriff, the role of Mr. Ford was also complete and his official duties ceased.  Accordingly, what he did next, he did as a concerned private citizen commenting upon critical issues of public concern.

43.  Following the completion of the internal investigation on April 8, 2020, the Plaintiff not only caused the report to be turned over to the District Attorney's office and spoke to the DA's lead investigator, he also contacted and discussed the matter with the local office of the FBI.  The Plaintiff would submit these activities were constitutionally protected.  The matters that were subject of the internal investigation and later passed on to the District Attorney's office

17

were of tremendous public importance. The matters not only involved a potential violation of a White County citizen's civil rights and a potential aggravated assault, but also concerned the ability of the White County Sheriff's Department to police itself. The issues involve matters of public trust and faith in the county's law enforcement agency and its chief law enforcement officer.

44.     Immediately upon his return from vacation and just days after reporting the Brandon Young investigation to Bryant Dunaway and the DA's office, the Plaintiff was terminated. Mr. Ford used the week he was off from work to talk to with the District Attorney General and/or its investigators as well as the FBI. Mr. Ford would submit he was terminated for exercising his First Amendment rights and engaging in constitutionally protected activities.

45.     Moreover, the termination of Mr. Ford would discourage persons of ordinary firmness from continuing this type of activity. Mr. Ford was not only terminated, but his character has been under attack by the Sheriff's Department, in the media and the community. Any citizen of ordinary firmness would be discouraged to come forward as a private citizen and report criminal and civil wrongdoing, if they knew they would be treated similar to the Plaintiff.

46.     Mr. Ford would submit he was terminated for speaking about the investigation to his former partner and DA Investigator Chris Isom as well as the FBI, and causing the report to be turned over the DA's office. He would submit it was more than a motivating factor, it was the only factor. Sheriff Page and the remaining defendants have continued the disingenuous refrain that Mr. Ford "did not follow the chain of command." This is merely code that Mr. Ford took the internal investigation report and gave it to an outside agency and spoke about it to outside law enforcement officials and that he spoke to those offices as well. The official reason given to the Plaintiff for his termination was that he was insubordinate. This is not only vague, but also

18

patently untrue. It is thinly veiled pretext for real the reason for his termination, which was his refusal to sweep the issues of the internal investigation under rug as demanded by Sheriff Page.

47. Steve Page is the duly elected Sheriff of White County, Tennessee and its chief law enforcement official. Sheriff Page has the ultimate decision-making authority when it comes to law enforcement in White County, Tennessee and how his office operates. As such, he made the ultimate and final decision regarding the Plaintiff's termination. He was the one who made the ultimate decisions regarding the internal investigation of Brandon Young and how it was to be handled within the department. He was the individual who made the final decision and had the decision-making authority to demand silence on, and an end to, the investigation, and reject the request for outside agency review. The ultimate actions of Sheriff Page, acting in concert with Defendants Lynch, Dobson, and Howard, constituted White County custom and/or policy. The letter of July 10, 2020 accurately reflects and amplifies the county policy as instituted by the Sheriff Page. The policy, as expressly articulated, is that individual officers are to stay silent about internal matters, no matter how important the issues or illegal the activity, and not to involve outside agencies, without the approval of the Defendant Page. This policy was the direct and exclusive cause and/or the moving force behind the Plaintiff's termination and the constitutional violations.

48. Defendant Richard Lynch had a supervisory role and authority over John Ford. He was well aware of the actions of Sheriff Page, who sought their input throughout this process. Defendant Lynch signed the termination letter and has told several individuals he was a part of the decision to fire John Ford. Richard Lynch was well aware of the constitutional violations. In fact, he encouraged and participated in the constitutional violations, including the retaliation and termination of the Plaintiff. He certainly authorized, approved, and knowingly acquiesced of the

19

unconstitutional conduct and the deprivation of Mr. Ford's constitutionally protected rights as guaranteed by the First Amendment to the United States Constitution.

49.    The actions and conduct of each of the Defendants violated clearly established constitutional rights that any reasonable person would have known. As a direct and proximate result of the Plaintiff's termination and the deprivation of his constitutionally protected rights, he has been injured and/or damaged as set forth in paragraph 39 of this Complaint.

50.    As such, each of the Defendants is liable to the Plaintiff pursuant to 42 U.S.C. § 1983. Defendants Steve Page and Richard Lynch are liable in their individual and official capacities. Defendant White County, Tennessee is liable due to the unconstitutional policies and customs as promulgated and executed by the individual Defendants and, in particular, Sheriff Page. The custom and/or policy not only arises from the multiple acts taken by Sheriff Page and his conduct throughout this ordeal, but also arises in written form as set forth in the letter dated July 10, 2020.

## IV.    STATE STATUTORY RETALIATION CLAIM

51.    The Plaintiff would adopt and re-state the claims set forth in paragraphs 1-50 as fully set forth herein.

52.    The Plaintiff brings this action against his former employer, Defendant White County, Tennessee pursuant to T.C.A. § 50-1-304, *et. seq.*

53.    During the internal investigation, the Plaintiff urged Sheriff Page and his supervisors to report the actions of Brandon Young to the office of the District Attorney for the Thirteenth Judicial District. He was of the opinion there was evidence of violations of the criminal and civil codes of Tennessee and the United State of America, including, but not limited to, a potential criminal aggravated assault charge and potential civil rights violations. He also

20

had concerns that Brandon Young had not been truthful in the criminal warrant which formed the basis of the arrest of Tonya Qualls.

54.     The actions of Brandon Young were "illegal activities" as defined by T.C.A. § 50-1-304(a)(3).  There was evidence that Brandon Young violated the criminal and/or civil codes of both the State of Tennessee and the United States of America.

55.     Following the completion of the internal investigation, Sheriff Page made it clear that he wanted the investigation to go "no further."  Sheriff Page had made his decision about what was going to happen to Branon Young, and he did not want any outside influence or interference.  As such, he directed his investigators to end their investigation and take no further action.  He ordered the matter closed.  He was very vocal about his wishes.

56.     Sheriff Page's oral directives were further clarified in the July 10, 2020 letter in which the policy of the White County Sheriff's Department was articulated in writing.  The Sheriff's policy is that no officer is allowed to involve outside agencies or law enforcement in an internal investigation without his approval.  It does not matter how egregious the conduct.  It does not matter how unlawful or illegal the activity.  It does not matter if the Sheriff is absolutely wrong on the issue or may have a conflict of interest.  Not only did Sheriff Page order his officers to remain silent about the illegal activities they uncovered in the Brandon Young investigation, his directive is part of formal White County policy.

57.     Mr. Ford refused to remain silent about Brandon Young's illegal activity.  He caused the internal investigation report to be turned over to the office of the District Attorney for the Thirteenth Judicial District and spoke about its contents and the investigation to Investigator Chris Isom beforehand.  He also spoke to the FBI.  Both of the entities constitute outside

agencies and/or third parties. And because he refused to remain silent about the illegal activities, he was terminated by Sheriff Page and White County in violation of T.C.A. § 50-1-304(b).

58. As noted above, the termination of John Ford had nothing to do with the ruse of regular insubordination or that he had a poor service record. On the contrary, he was a decorated and highly regarded law enforcement officer for many years. He rose to the level of chief of the Investigations Division, a promotion he received from Sheriff Page less than two years prior. The assertion that he was terminated for any other reason than his refusal to remain silent about illegal activity is absurd and pure pretext. John Ford was never demoted, reassigned, disciplined, or re-trained for any these supposed acts of insubordination, despite the fact that the December 2019 write-up was styled as a "final warning."

59. As a direct and proximate result of the Plaintiff's termination, resulting from the retaliation for his refusal to remain silent about illegal activities, he has been injured and/or damaged as set forth in paragraph 39 of this complaint.

60. Accordingly, the Plaintiff would submit Defendant White County, Tennessee is liable to him for retaliating against him because of his refusal to remain silent about illegal activities in violation of T.C.A. § 50-1-304.

## V. PUNITIVE DAMAGES

61. The Plaintiff would adopt and re-state the claims set forth in paragraphs 1-61 as fully set forth herein.

62. The Plaintiff would submit the actions and conduct of the individual Defendants, with regard to the deprivation of his rights as guaranteed by the United States Constitution, were reckless, malicious, wanton and/or callously indifferent.

22

63. Moreover, the individual Defendants were motivated by evil intent. The Plaintiff would submit the conduct of the Defendants should be punished and there is a need to deter these actors and similarly situated individuals from future conduct of this kind. Accordingly, the individual Defendants are each liable to the Plaintiff for punitive damages.

## VI.     PRAYER

**WHEREFORE PREMISES CONSIDERED** the Plaintiff would pray this Honorable Court for the following relief:

A.     That process issue upon each of these Defendants, and they each be required to file a response within the time period prescribed by law;

B.     That an early trial date be scheduled, following a due course of discovery pursuant to case management;

C.     That a jury be empaneled to hear all issues so triable;

D.     That the Plaintiff be granted a judgment against all of the Defendants, jointly and severally, for all compensatory damages he may show himself entitled in the final trial of his cause;

E.     That the Plaintiff be granted a judgment against all of the individual Defendants for punitive damages to be determined against each Defendant in the final trial of this cause;

F.     That the Plaintiff be awarded a judgment for his reasonable attorney fees pursuant to T.C.A. § 50-1-304 and 42 U.S.C. § 1988; and

G.     For general relief.

23

**RESPECTFULLY SUBMITTED** this the ___30___ day of **November, 2020**.

JOHN FORD

By: _____
MICHAEL R. GIAIMO, BPR#019394
Attorney for the Plaintiff
204 N. Washington Avenue
Cookeville, Tennessee 38501
(931) 372-7515
mrgiaimo@yahoo.com

By: _____
VICTOR HUGO GERNT, BPR#032460
Attorney for the Plaintiff
27 N. Main Street
Sparta, Tennessee 38583
(931) 256-8484
victor@jmglawoffice.net

By: _____
BRUCE A. MACLEOD, BPR#031674
Attorney for the Plaintiff
27 N. Main Street
Sparta, Tennessee 38583
(931) 256-8484
bruce@jmglawoffice.net


## OATH

Comes now John Ford, Plaintiff in the above-styled cause of action, who would state and depose that he has reviewed the foregoing complaint and that the averments contained therein, both statement and in fact, are true and correct to the best of his knowledge, information and belief.

_____
JOHN FORD

Sworn and subscribed to before me this the ___30___ day of November, 2020.

_____
NOTARY PUBLIC

My commission expires: 11-20-23

ASHLAND DILLON
STATE OF TENNESSEE
NOTARY PUBLIC
PUTNAM COUNTY

24