**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN FORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:20-cv-00076** |
| | ) | |
| **STEVE PAGE, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

John Ford has filed a Complaint against White County, Tennessee Sheriff Steve Page, Major Richard Lynch, and White County, Tennessee, for retaliatory discharge in violation of the First Amendment under 42 U.S.C. § 1983 and the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304. (Doc. No. 1). This case arises from Ford's termination from the White County Sheriff's Department after he reported to outside law enforcement authorities a violent incident involving a deputy sheriff in the scope of his duties. <u>Id</u>. Pending before the Court is Defendants' fully briefed Motion for Summary Judgment. (Doc. Nos. 30-32, 36-39, 40-41). For the following reasons, the motion will be denied.

**I.      Legal Standard**

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). The Court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

## II.     Factual Background[1]

As sheriff, Page is the chief law enforcement officer of White County, Tennessee and has final decision-making authority for the White County Sheriff's Department ("WCSD"). (Doc. No. 40 ¶¶ 35-37). He requires WCSD employees to comply with WCSD's policies and procedures. (Id. ¶¶ 40, 44).

When Page was elected, he promoted John Ford to the position of captain in charge of investigators. (Id. ¶ 45). He also promoted Richard Lynch to major in charge of professional standards. (Id. ¶ 42; Doc. No. 37 at ¶ 47). Lynch became openly dissatisfied with Ford, which was reflected in a yearlong series of verbal and written criticisms concerning Ford's alleged insubordination in an attempt to get Page to fire Ford. (Doc. No. 37 ¶¶ 47-55, 72). On September 29, 2019, Lynch submitted a letter to Page alleging deficiencies in Ford's job performance and recommending that Ford be suspended without pay for three days.[2] (Doc. Nos. 30-2 at 44-45; 37 at ¶ 54). Page declined to suspend Ford but counseled him on the importance of following the chain of command. (Id. ¶¶ 54-57). On December 30, Page wrote a "Verbal Counseling" that memorialized instructions to Ford about the chain of command and improving communications with Lynch. (Doc. No. 30-2 at 49). He continued his criticism of Ford in a January 2, 2020, email, and three unsigned letters (dated January 21, February 5, and February 12) concerning alleged

---

[1]     The following facts are drawn from the parties' Statements of Undisputed Material Facts and responses thereto. (Doc. No. 37 and 40).

[2]     It is disputed whether Lynch was Ford's supervisor or commander, and thus had the power to reprimand or otherwise discipline Ford. More generally, the parties dispute the validity and impact of the unsigned letters from Lynch found in Ford's file. (See Doc. No. 37 ¶¶ 53, 56.)

2

"insubordination" regarding office matters. (Doc. Nos. 37 ¶¶ 58-59, 61-64; 30-2 at 50-53). Page believed that Lynch placed the unsigned letters into Ford's file because he wanted Ford terminated. (Doc. No. 40 ¶ 54).

On February 25, 2020, Page instituted a new policy that required written authorization before any investigative materials were released to another agency. (Doc. No. 37 ¶ 65-66). On April 3, WCSD Deputy Brandon Young repeatedly deployed his K-9 dog on Tonya Qualls during service of a felony warrant. (Doc. No. 37 ¶¶ 1-2). Page hired Young because he was "proactive" and presented a lot of drug cases for prosecution, so Page did not want Young to get in trouble. (Id. ¶ 6; Doc. No. 40 ¶ 57, 58). Nevertheless, Page directed Ford to perform an internal investigation into Young's conduct. (Doc. No. 37 ¶¶ 4, 6). After hearing a description of the Qualls incident, Ford believed that the investigation should be handled by the District Attorney's Office. (Id. ¶ 5.) Captain of patrol John Meadows, however, instructed Ford that Page would not agree and directed Ford to continue the investigation. (Id. ¶ 6). The investigation was an important matter of public concern because it concerned potential police misconduct. (Doc. No. 40 ¶ 16).

Ford led the investigation with the assistance of Detective Muncy. (Id. ¶ 3; Doc. Nos. 37 ¶ 7). After gathering a video of the incident and other evidence, Ford told Muncy that they needed to talk to the District Attorney. (Doc. No. 37 ¶¶ 8-9). Ford believed that Young may have committed a criminal offense and the investigation should be turned over to the District Attorney's Office. He voiced his opinion to Muncy, Chief Deputy Dobson, Meadows, and Chris Isom of the District Attorney's Office. (Doc. No. 40 ¶¶ 18-19). He did not seek authorization before communicating with Isom. (Id. ¶ 67).

On April 8, 2020—five days after the Qualls incident—Ford and Muncy met with Page, Lynch, and Chief Deputy Dobson. (Id. ¶ 19). Prior to the meeting, Lynch believed that Young

should be terminated based solely on the video evidence. (Id. ¶ 8). During the meeting, Ford repeated that the matter should be turned over to the District Attorney. (Doc. No. 37 ¶¶ 25-26). Page, however, appeared to be mad. (Id. ¶ 20). He had consulted a retired K-9 dog handler who suggested that the Qualls incident was merely a mistake. (Id. ¶¶ 14-18). Without reviewing the investigative report, Page informed the group that "the dog malfunctioned;" ordered Ford to end the investigation; stated that Young would receive an administrative punishment; and concluded there was no need to talk to the district attorney other than perhaps a "courtesy call." (Id. ¶¶ 22-24, 26; Doc. No. 40 ¶¶ 9-10, 13, 51). Lynch concurred with Page's assessment. (Doc. No. 40 ¶ 14). Ford instructed Muncy to document the meeting. (Doc. No. 37 ¶ 28).

Later that afternoon, Page instructed Muncy to bring him the entire incident file. (Id. ¶ 29). Muncy met Page in a parking lot and handed over the file. (Id. ¶ 31). According to Muncy, Page said: "I don't want this"; "this is not to go any further"; and "I trust you, but I don't trust other people down there. And if it goes any further, people are going to start losing their job, starting with John Ford." (Id. ¶ 32; Doc. No. 40 ¶¶ 4-5). The next day, Page memorialized his conclusions in a letter to Young. (Doc. No. 40 ¶ 17). Soon after, Qualls's counsel filed a motion to withdraw her guilty plea to the charge of resisting arrest. (Doc. No. 36-3 at 19-20). Page directed Lynch to personally ask the trial judge to "reconsider dismissing or withdrawing the charges" against Qualls. (Id.; Doc. No. 40 ¶¶ 33-34).

At Page's direction, Ford ceased his official work on the Young investigation. (Doc. No. 40 ¶ 57). However, he still believed that Page was trying to cover-up Young's conduct. (Id. ¶ 21). As a private citizen and on his private time, Ford decided to contact Isom of the District Attorney's Office and the Federal Bureau of Investigation ("FBI") about the Qualls incident and the internal investigation into Young. (Id. ¶¶ 21-23, 57). Ford had no job-related obligation or duty to report

4

the investigation to the District Attorney's Office or FBI, and did not have Page's permission to do so. (Id. ¶ 15). Isom confirmed that Ford told him about the internal investigation, asserted that Young violated Qualls's civil rights, and that Page was trying to cover it up. (Id. ¶ 24). Ford also informed Isom that Muncy had a video of the incident. (Id. ¶ 25; Doc. No. 37 ¶ 35). Isom made a phone call, asked for a copy of the video, and left in a hurry. (Doc. No. 37 ¶ 36). Soon after, District Attorney Bryant Dunaway called Muncy, directed him to, "bring me everything you have[,] I need to talk with you now." (Id. ¶ 38; Doc. No. 40 ¶ 26). Isom obtained the investigative file from Muncy and presented it to Dunaway, who then turned it over to the FBI. (Doc. Nos. 37 ¶ 39-41; 40 ¶ 27).

On May 5, 2020, Lynch placed an unsigned, two-sentence letter in Ford's file that alleged failure to follow the chain of command regarding an official matter. (Doc. No. 30-2 at 55). That same day, Lynch also prepared a memorandum to Page and Dobson recommending Ford's termination for "failure to follow the chain of command and insubordination."[3] (Doc. Nos. 37 ¶ 70; 30-2 at 56). On May 7, Page met attorney Stephanie Johnson at the courthouse and told her: "I'm under a lot of stress. I've got the [Tennessee Bureau of Investigation] on me. I've got the FBI on me. People are jealous, just trying to cause problems."[4] (Doc. Nos. 37 ¶¶ 43-45; 40 ¶ 1; 36-4 at 4). On May 8, Page spoke to an FBI agent about Qualls's arrest and received an FBI subpoena concerning the incident. (Doc. Nos. 37 ¶ 42; 40 ¶ 29). That same day, Page signed the memorandum terminating Ford. (Doc. No. 37 ¶ 74). Ford was formally terminated after Dobson co-signed the memorandum. (Id.) On July 10, WCSD's Public Information Officer responded to a query about the Qualls investigation and Ford's termination by stating in part: "It is ultimately the

---

[3]      It is disputed whether Lynch knew about the FBI investigation when he prepared the memorandum. (See Doc. No. 37 ¶ 71).

[4]      Page does not recall this conversation but does not dispute that it occurred. (Doc. No. 40 ¶ 1).

sheriff's responsibility to engage outside agencies to determine if criminal charges are necessary.

. . . It is not the role or duty of anyone employed at the [WCSD] to take internal investigative information outside of the agency without the approval of Sheriff Page." (Doc. No. 40 ¶ 59).

## III.    Analysis

### A.    First Amendment Retaliation Claim

Ford first asserts that he was retaliated against for exercising his free speech rights in violation of the First Amendment to the United States Constitution. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citation omitted). However, public employees do not forfeit all of their First Amendment rights simply because they are employed by the state or a municipality. Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531 (6th Cir. 2012) (citing Connick v. Myers, 461 U.S. 138, 142 (1983)). The Supreme Court has clarified that the First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern. Id. (citing Garcetti, 547 U.S. at 417). "A First Amendment retaliation claim has three elements: '(1) the plaintiff engaged in protected conduct [i.e., constitutionally protected speech]; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct.'" Myers v. City of Centerville, 41 F.4th 746, 759 (6th Cir. 2022) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999)) (en banc); DeCrane v. Eckart, 12 F.4th 586, 593 (6th Cir. 2021).

For purposes of summary judgment, Defendants do not dispute that some of Ford's speech was protected conduct or that Ford's termination could constitute an adverse action.[5] (Doc. Nos.

---

[5]    The Court of Appeals has held that reporting police corruption is a matter of public concern. See v. City of Elyria, 502 F.3d 484, 493 (6th Cir. 2007). In addition, it is axiomatic that termination of

6

31 at 12-13; 41 at 1). Rather, Defendants challenge the third element, which "ultimately requires a 'but-for' causal connection—meaning that the public employer would not have taken the harmful action 'but for' the protected speech."[6] DeCrane, 12 F.4th at 602 (citing Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019)). In other words, Ford must adduce evidence "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). The causation element therefore "presents a pure fact question about the reason(s) for the adverse action," DeCrane, 12 F.4th at 602 (citing Fakhoury v. O'Reilly, 837 F. App'x 333, 341 (6th Cir. 2020), that is reserved for the jury "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." Barefield v. Hillman, 475 F. Supp. 3d 794, 813-14 (M.D. Tenn. 2020) (collecting cases), rev'd and remanded on other grounds, No. 20-6002, 2021 WL 3079693 (6th Cir. July 21, 2021); see also Harris v. Bornhorst, 513 F.3d 503, 519 (6th Cir. 2008) ("Usually, the question of causation is a factual issue to be resolved by a jury."). The Court may rely on circumstantial evidence, including temporal proximity, to find that the causation element has been satisfied. King v. Zamiara, 680 F.3d 686, 695 (6th Cir. 2012); see also

---

employment is an adverse action for purposes of employment discrimination. See Giron v. Tyco Elecs. Corp., 762 F. App'x 233, 237 (6th Cir. 2019) (citing Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996) (including "termination of employment" in a list of actions qualifying as adverse employment actions)). In conceding these matters for purposes of summary judgment, Defendants did not argue that Ford's speech failed the balancing test set forth in Pickering v. Bd. of Educ., 391 U.S. 563 (1968). Accordingly, the Court does not reach this issue.

[6]     As a threshold matter, Defendants assert that the Court should grant summary judgment on this ground because Ford has "waived" opposition to it. (Doc. No. 41 at 1-2). Although Ford spills a fair amount of ink on issues Defendants conceded, he does respond to Defendants' causation argument. (See, e.g., Doc. No. 39 at 12 (asserting that "there was a causal connection between the foregoing elements and the termination was motivated at least in part by the Plaintiff's protected conduct."); id. at 12 (asserting that Ford's termination was in close temporal proximity to his protected speech and "when he spoke out . . . he was terminated").

Harris, 513 F.3d at 519 ("Usually, the question of causation is a factual issue to be resolved by a jury and may be satisfied by circumstantial evidence.")

Here, disputes of fact regarding causation are readily apparent. Plaintiff has presented admissible direct and circumstantial evidence that he disclosed information about an alleged WCSD cover-up and triggered an outside investigation that led to the federal indictment of a WCSD deputy. In addition, Ford has adduced admissible evidence that Page, who favored the deputy under investigation, terminated Ford almost immediately after intervention of the FBI. (See Doc. No. 31 at 21) (conceding that Ford "can show Page knew about the FBI's investigation" prior to Ford's termination). This "chronology of events supports an inference of causation." Handy-Clay, 695 F.3d at 546 (explaining that delay of one day give rise to a "strong inference" that protected speech was a motivating factor in termination); Paige v. Coyner, 614 F.3d 273, 283 (6th Cir. 2010) (reaching same conclusion for one week delay). Defendants have adduced conflicting evidence in the form of Lynch's write-ups for "insubordination," but Lynch's motivation, authority, and timing are in dispute. At this stage, Defendants have not established "that the employment decision would have been the same absent the protected conduct," Barrow v. City of Hillview, Ky., 775 F. App'x 801, 810 (6th Cir. 2019), or—as claimed by Defendants—that there is "no evidence" of retaliatory motivation. (Doc. No. 31 at 17). Accordingly, it is for a jury to decide whether Ford's alleged insubordination establishes that he would have been terminated regardless of his protected speech. See, e.g., Barefield, 475 F. Supp. 3d at 814 (declining to grant summary judgment on causation because factual disputes required consideration by the trier of fact).

Page and Lynch also raise the defense of qualified immunity. Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). Thus, a defendant is not entitled to qualified immunity if the evidence supports a violation of a constitutional right and that right "was clearly established when the event occurred so that a reasonable offic[ial] would have known that his conduct violated it." Myers, 41 F.4th at 758 (quoting Crawford v. Tilley, 15 F.4th 752, 762-63 (6th Cir. 2021)); Pearson v. Callahan, 555 U.S. 223, 227 (2009). A right is clearly established when a reasonable officer would know—in the given situation and with the information known to him at the time—that his conduct violated that right. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Lynch contends that he is entitled to qualified immunity because he was not aware of Ford's protected speech and thus did not violate clearly established law. This argument is not supported by the record. In his deposition, Lynch testified that he could not remember when Ford contacted Isom and when or how he learned of Ford's communications with Isom. (Doc. No. 30-4 at 3-8, 9-11). He also testified that he may have discussed Ford's termination with Page "from time to time" or "in passing" because he spoke with Page "many times." Id. Finally, Lynch admitted that (1) he was notified of the FBI subpoena by Page and (2) Ford's communication with Isom supported his termination signed by Lynch, Page, and Dobson. Id. Thus, the record does not allow a reasonable inference that Lynch was unaware of Ford's protected communications at the time of Ford's termination. At the very least, the record suggests that Lynch may have learned of the FBI investigation in close temporal proximity prior to Ford's termination by Lynch, Dobson, and Page. If the jury believes this is true, Lynch is not entitled to qualified immunity.

Page contends that he is entitled to qualified immunity because terminating Ford with a "hidden discriminatory animus" did not violate clearly established law. The Court of Appeals

"ha[s] repeatedly held—[it has] repeatedly clearly established—that employers may not retaliate against employees based on their protected speech." Hudson v. City of Highland Park, Mich., 943 F.3d 792, 798 (6th Cir. 2019) (citing Buddenberg v. Weisdack, 939 F.3d 732, 741 (6th Cir. 2019)); Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1, 131 F.3d 564, 579-80 (6th Cir. 1997). Thus, "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern." Myers, 41 F.4th at 766 (quoting Chappel, 131 F.3d at 580). Accordingly, "all that concerns us" is whether Ford has adduced adequate evidence "that [Page] fired him for his speech." Hudson, 943 F.3d at 798-99. That Page may have "hidden" his retaliatory animus is irrelevant to this determination. As discussed above, Ford has adduced evidence sufficient for a jury to find that Defendants terminated him based on his communications with outside agencies. Because Ford's First Amendment retaliation claim is clearly established, Page is not entitled to qualified immunity.

**B.** **TPPA Retaliatory Discharge Claim**

Ford also brings a retaliation claim against White County, Tennessee under the TPPA, which is sometimes referred to as Tennessee's "Whistleblower Act." Ford asserts that he was terminated for "blowing the whistle" on Young's illegal activities. (Doc. No. 1 at 21). Such a claim contains four elements: "(1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to remain silent about the illegal activity." Grizzard v. Nashville Hosp. Cap., LLC, No. 3:18-cv-00034, 2021 WL 3269955, at *26 (M.D. Tenn. July 30, 2021) (quoting Ford v. Chad Youth Enhancement Ctr., No. 3:08-cv-635, 2010 WL 1177334, at *11 (M.D. Tenn. Mar. 24, 2010)); VanCleave v. Reelfoot Bank, No. W200801559COAR3CV, 2009 WL 3518211, at *8

(Tenn. Ct. App. Oct. 30, 2009). Under the TPPA, "illegal activities" include "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety or welfare."[7] Tenn. Code Ann. § 50-1-304.

In a brief discussion of this claim, Defendants contend only that Ford cannot satisfy the fourth element because conflicting record evidence shows that Ford's refusal to remain silent was not the "sole" reason for his termination. (Doc. No. 31 at 18-19). This argument, however, conflates the weight of the evidence — a matter for the jury — with the existence of disputed facts that require resolution by the jury. As discussed, (and as Defendants appear to acknowledge), disputes of material fact exist concerning the reasons for Ford's termination. Accordingly, the Court cannot conclude that the basis for Ford's termination is undisputed. Ford has offered evidence from which a reasonable jury could find that Ford's asserted "insubordination" was a pretext for unlawful retaliation, so summary judgment is inappropriate on this claim. See Tenn. Code. Ann. 50-1-304(f).

---

[7]    "[U]nder the TPPA, illegal activity requires violation of a state or federal statute or regulation." Grizzard, 2021 WL 326955, at *27 (quoting Davis v. Vanderbilt Univ. Med. Ctr., No. M201901860COAR3CV, 2020 WL 4516094, at *3 (Tenn. Ct. App. Aug. 5, 2020)); see also Williams v. Greater Chattanooga Pub. Television Corp., 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) ("[T]he 'illegal activity' or violation by the employer must implicate important public policy concerns."). "[I]t is [ ] possible to maintain a TPPA claim when the Plaintiff reasonably believes that the conduct is illegal." Grizzard, 2021 WL 326955, at *30 n.52 (citing Williams, 349 S.W.3d at 515). Here, Ford believed that Young potentially violated the laws of Tennessee and the United States by committing an assault on Qualls. (See, e.g., Doc. Nos. 40 at ¶ 7; Doc. No. 36-1 at 5-7). Moreover, it is undisputed that Muncy and Lynch believed the incident video showed a potential criminal offense or violation of civil rights. (Doc. No. 40 at ¶ 7). Young was ultimately indicted in this district for violating Qualls's civil rights by physically assaulting her with a canine under color of law. (Doc. No. 36-9). The Court takes judicial notice that, on October 17, 2022, Young entered a plea of guilty to violating an individual's constitutional rights while acting under color of law. United States v. Young, 2:22-cr-00012 (Doc. No. 18). Accordingly, the Court finds sufficient record evidence to conclude, for purposes of summary judgment, that Ford's actions concerned a violation of federal law that implicated important public policy concerns.

**IV.     Conclusion**

For these reasons, Defendant's Motion for Summary Judgment (Doc. No. 30) is denied.

This case will proceed to trial pursuant the Court's February 10, 2022, Order (Doc. No. 16).

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE